IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:23-CR-498 |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | |
| | ) | |
| SHYHEIM ROBERSON, | ) | RESPONSE IN OPPOSITION TO |
| | ) | DEFENDANT'S MOTION TO DISMISS |
| Defendant. | ) | THE INDICTMENT (ECF 22) |

Now comes the United States of America, through its undersigned counsel, responding in opposition to Defendant Shyheim Roberson's Motion to Dismiss the Indictment. (ECF 22).

Roberson claims that 18 U.S.C. § 922(o), which prohibits the possession or transfer of machineguns manufactured after 1986, is facially unconstitutional under the Second Amendment, and also unconstitutional as applied to his conduct. See (ECF 22).

The Court should deny Roberson's motion for the following reasons. *First*, courts across the country, including the Sixth Circuit, have consistently held that machineguns fall outside the text and scope of the Second Amendment's protections. *Second*, even assuming that machineguns do fall within the Second Amendment's text and scope, this nation's history and tradition fully support the long-standing federal restrictions on possessing and transferring machineguns. *Third and finally*, Roberson's as-applied challenge fails, especially in light of his criminal conduct of illegally importing machinegun parts from Russia and China, and then reselling them to others through social media.

This Court should therefore DENY Roberson's motion to dismiss the indictment.

**Facts and Procedural History**

The indictment charges Roberson with one count of Conspiracy to Illegally Possess Machine Guns, in violation of 18 U.S.C. §§ 371 and 922(o)(1), and one count of Illegal Possession of Machine Guns, in violation of 18 U.S.C. § 922(o)(1).  (ECF 1: Indictment).

The indictment is based on Roberson's illegal importation, possession, and sale of devices called "Glock switches."  (Id.).  As alleged in the indictment, a "Glock switch" is "a small part that, when installed on the rear slide of a Glock-style pistol, converts the pistol from semi-automatic fire to fully-automatic fire."  (Id. at ¶ 1).  A Glock switch qualifies as "machinegun" under both Title 18 and Title 26 of the United States Code, because it is a "part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."  (Id. at ¶ 2) (citing 18 U.S.C. § 921(a)(24) and 26 U.S.C. § 5845(b)).

The indictment describes Roberson's criminal conduct in detail.  Specifically, the indictment alleges that Roberson:

- "used phone messaging apps, such as Telegram and WhatsApp, to communicate with sellers of Glock switches in other countries, including Russia and China";

- "placed orders for Glock switches from those international sellers and arranged to have the switches shipped to the United States";

- "maintained social media accounts, including an Instagram account and a YouTube channel, on which he displayed Glock switches and advertised the switches for sale";

- "sold Glock switches to individuals in the United States, including individuals in Cleveland, Ohio"; and

- "directed other conspirators to advertise his Glock switches for sale on social media, and offered to pay those conspirators a commission if they successfully sold a Glock switch on his behalf."

(Id. at ¶ 6).

The indictment also details a number of Roberson's conversations and social media posts about the importation and sale of Glock switches.  For example, paragraph 13 of the indictment describes a February 2022 Telegram messaging conversation between Roberson and a Glock switch dealer in Russia (the "Russian Seller"), where the two discussed the difficulty of shipping Glock switches and other firearms from Russia to the United States due to the war in Ukraine:

> The Russian Seller stated, "hello. 2 times customs returned the parcel to me. Now I asked a person to send you a package. as soon as it passes Russian customs, I will immediately give you a tracker [tracking number]."  ROBERSON replied, "I haven't ordered nothing yet I was wondering do you guys have anything new ? . . . And they probably return the package because war [between Russia and Ukraine] starting . . ."  Later in the conversation, ROBERSON asked, "Still no automatic attachment for ak-47 ?"  The Russian Seller replied, "47 or akm [meaning an AK-47 or AKM firearm]?"  ROBERSON replied, "47 century arms [meaning that ROBERSON wanted to order a full-auto switch for an AK-47-style firearm manufactured by Century Arms].

(Id. at ¶ 13).

Similarly, paragraph 19 of the indictment describes an October 2022 messaging conversation between Roberson and a Glock switch dealer in China (the "Chinese Seller"), where the two discussed how the Chinese Seller had "many wholesaler customers," and had "ship[ped] [Glock switches] disguised as keychains and accessories" to avoid detection:

> ROBERSON asked, "How much 50 ? . . . if you buy 50 [Glock switches] . . . I have a freight forwarder in China will you be will[ing] to send there ?"  The Chinese Seller replied, "No . . . For our safety, we do not send to China, because sending to China can track my location, it is not safe for me . . . China's express tracking is very accurate, it will expose our . . . Sending abroad will not be exposed."

(Id. at ¶ 19).

3

And paragraph 26 of the indictment describes an October 2022 messaging conversation between Roberson and one of his associates ("User -2029"), in which Roberson instructed User -2029 to post Roberson's Glock switches for sale on a social media account:

> ROBERSON then sent a media file that depicted him holding two Glock-style handguns with switches attached to the firearms, with a caption that said, "*Switches tap in . . . 1 for $500 2 for $800.*"  User -2029 replied, "Bet that's way better lol . . . I just posted it."

(Id. at ¶ 26).

Law enforcement eventually obtained a search warrant for Roberson's apartment in Willowick, Ohio, which they executed on January 9, 2023.  See (id. at ¶ 29, 34).  As a result of the search warrant, law enforcement seized from Roberson's apartment three Glock switches, approximately seven firearms (including two Glock pistols), and various ammunition and firearms accessories.  See (id.).  Roberson's possession of those three Glock switches forms the basis of Count 2 of the indictment (Illegal Possession of Machine Guns), as well as an act in furtherance of Count 1's Conspiracy to Illegally Possess Machine Guns.  (Id. at ¶ 34, 35).

On February 29, 2024, Roberson filed a motion to dismiss the indictment, arguing that 18 U.S.C. § 922(o), which prohibits the possession or transfer of machineguns manufactured after 1986, is unconstitutional under the Second Amendment, both facially and as-applied to his conduct.  (ECF 22).  This Court should deny Roberson's motion.

## **Argument**

As explained below, this Court should deny Roberson's motion.  *First*, case law shows that machineguns fall outside the text and scope of the Second Amendment's protections. *Second*, even assuming that machineguns do fall within the text and scope of the Second Amendment's protections, this nation's history and traditions fully support Section 922(o)'s prohibition on the possession of machineguns manufactured after 1986.  *And third*, Roberson's

4

as-applied challenge fails, especially given his conduct of importing black market Glock switches into the United States from Russia and China, and then reselling them through social media posts.

### A.      HISTORY OF MACHINEGUN REGULATION IN THE UNITED STATES

Shortly after World War I, the machinegun entered the civilian market and was soon widely used by criminals.  See John Ellis, The Social History of the Machine Gun 149-77 (1986).  Although many States across the nation enacted bans,[1] these automatic weapons—which shoot "more than one shot, without manual reloading, by a single function of the trigger,"  26 U.S.C. § 5845(b); 18 U.S.C. § 921(a)(24)—brought a crisis "beyond the power of control of merely local authorities," National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means, 73d Cong. 4 (1934) (statement of Attorney General Homer Cummings).

To address the "law violator" and "his most dangerous weapon," S. Rep. No. 73-1444, at 1-2 (1934), the National Firearms Act of 1934 ("NFA") enacted a $200 tax on machineguns

---

[1] See, e.g. Machineguns: Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24-32; Act of May 16, 1927, ch. 552, § 1, 1927 Cal. Stat. 938; Act of Mar. 19, 1927, ch. 95, § 2, 1927 N.J. Laws 181; Act of Mar. 9, 1927, ch. 156, § 1, 1927 Ind. Acts 469; Act of Apr. 19, 1927, ch. 234, § 1, 1927 Iowa Acts 201; Act of Apr. 22, 1927, ch. 1052, § 4, 1927 R.I. Pub. Laws 257; Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413-14; Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 888-89; Act of May 28, 1929, ch. 132, § 1, 1929 Wis. Laws 157; Act of Apr. 25, 1929, No. 329, § 2, 1929 Pa. Laws 777; Act of Apr. 29, 1929, ch. 190, § 1, 1929 Neb. Laws 674; Act of June 1, 1929, H.R. 498, § 1, 1929 Mo. Laws 170; Act of Feb. 25, 1931, ch. 249, § 1, 1931 Del. Laws 813; Act of Mar. 9, 1931, ch. 178, § 2, 1931 N.D. Laws 306; Act of Apr. 15, 1931, ch. 435, § 1, 1931 N.Y. Laws 1033; Act of July 2, 1931, § 2, 1931 Ill. Laws 452; Act of July 7, 1932, No. 80, § 2, 1932 La. Acts 337; Act of Feb. 28, 1933, ch. 206, §§ 1-5, 1933 S.D. Laws 245; Act of Mar. 6, 1933, ch. 64, § 1, 1933 Wash. Laws 335; Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 489; Act of Apr. 8, 1933, No. 64, 1933 Ohio Laws 189; Act of Apr. 10, 1933, ch. 190, § 3, 1933 Minn. Laws 233; Act of Apr. 27, 1933, No. 120, § 2, 1933 Haw. Laws 117; Act of Oct. 25, 1933, ch. 82, §§ 2-3, 1933 Tex. Laws 219; Act of Nov. 28, 1933, ch. 62, § 1, 1933 Kan. Laws 76; Act of Mar. 2, 1934, No. 731, §§ 2-4, 1934 S.C. Acts 1288; Act of Mar. 7, 1934, ch. 96, §§ 2-5, 1934 Va. Acts 137.

and required that they be registered with the federal government.  See 26 U.S.C. §§ 5801-5802, 5811-5812, 5821-5822, 5841-5842, 5845(a)-(b).  Congress made a violation of the NFA punishable by up to ten years in prison and a fine.  26 U.S.C. § 5871.  In this way, the NFA made it more difficult for "the criminal class" to obtain the weapons and made it easier to "convict [criminals] when they have the weapons."  National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means, 73d Cong. at 6, 12, 22 (statement of Attorney General Homer Cummings).  The NFA placed similar restrictions on short-barreled rifles and shotguns, silencers, and destructive devices, by requiring those weapons to be taxed and registered as well. 26 U.S.C. § 5845(a).

By 1986, however, there was a "need for more effective protection of law enforcement officers from the proliferation of machine guns."  H.R. Rep. No. 99-495, at 7 (1986).  In response, Congress enacted the Firearm Owner's Protection Act of 1986, which included a prohibition on the transfer and possession of newly-manufactured machineguns.  Congress therefore made it a crime under Title 18 "to transfer or possess a machinegun," id. § 922(o)(1), manufactured after the effective date of the law, which is May 19, 1986, see id. § 922(o)(2)(B), unless a governmental entity is involved in the transfer or possession, see id. § 922(o)(2)(A).  A violation of 18 U.S.C. § 922(o) is likewise punishable by up to ten years in prison and a fine.  18 U.S.C. § 924(a)(2).

Both statutes (the NFA in Title 26, and the post-1986 machinegun ban in Title 18) define machineguns to include any "part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."  26 U.S.C. § 5845(b); 18 U.S.C. § 921(a)(24).

B.      MACHINEGUNS FALL OUTSIDE THE TEXT AND SCOPE OF THE SECOND AMENDMENT.

"Like most rights . . . the right secured by the Second Amendment is not unlimited."

District of Columbia v. Heller, 554 U.S. 570, 626 (2008).  It does not allow every person "to

keep and carry any weapon whatsoever in any manner whatsoever for whatever purpose."  Id.

Accordingly, the test for whether a firearm restriction violates the Second Amendment is as

follows:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.…  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 17 (2022).

A review of case law, including binding precedent from the Sixth Circuit, shows that

machineguns fall outside the text and scope of the Second Amendment.  Roberson's facial

challenge to Section 922(o) can therefore be resolved at the first part of this test.

        1.      *United States v. Miller*, 307 U.S. 174 (1939)

In 1939, roughly five years after the NFA was enacted, the Supreme Court considered the

statute's constitutionality in the case of United States v. Miller, 307 U.S. 174 (1939).  There, two

men were charged with violating the NFA by transporting an unregistered short-barreled shotgun

in interstate commerce.  Id. at 175.  The Supreme Court unanimously rejected their argument that

the NFA violated the Second Amendment, and explained that "[i]n the absence of any evidence

tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches

in length' at this time has some reasonable relationship to the preservation or efficiency of a well

regulated militia, we cannot say that the Second Amendment guarantees the right to keep and

bear such an instrument[,]" because a short-barreled shotgun was not "any part of the ordinary military equipment or that its use could contribute to the common defense." Id. at 178.

Although Miller pre-dates the Supreme Court's more recent Second Amendment decisions in Heller and Bruen (which are discussed more below), it nonetheless supports the historical understanding that NFA firearms, like short-barreled shotguns, fall outside the scope and text of the Second Amendment's protections.

2. *United States v. Warin*, 530 F.2d 103 (6th Cir. 1976)

In line with Miller, the Sixth Circuit in United States v. Warin, 530 F.2d 103 (6th Cir. 1976) held that the Second Amendment did not bar the prosecution of a defendant charged under the NFA with possessing an unregistered submachine gun.  In doing so, Warin rejected the notion that Supreme Court's decision in Miller had given Second Amendment protection to "any weapon having military capability." Id. at 105.  As Warin explained, "[t]he [Supreme] Court did not hold [in Miller] that the Second Amendment is an absolute prohibition against all regulation of the manufacture, transfer and possession of any instrument capable of being used in military action." Id. at 106.

So although the Sixth Circuit's decision in Warin also pre-dates Heller and Bruen (and was based on the assumption that the Second Amendment was a "collective rather than an individual right," Warin, 530 F.2d at 106, which was later rejected by Heller), Warin still fully supports the historical understanding that NFA firearms— and in particular, machineguns—fall outside the text and scope of the Second Amendment's protections.

3. *District of Columbia v. Heller*, 554 U.S. 570 (2008)

In District of Columbia v. Heller, 554 U.S. 570 (2008) the Supreme Court held that the Second Amendment right to keep and bear arms was an individual right, not a collective right that applied to militias.  But Heller made clear that the Second Amendment right—"like most

8

rights"—is not unlimited, as it does not allow every person "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Id. at 626.

Relevant here, Heller revisited the Court's earlier 1939 decision in Miller (upholding the NFA's restriction on unregistered short-barrel shotguns), and clarified that Miller was based on the understanding that certain firearms fall outside the scope of the Second Amendment's protections:  "[T]he Court's basis for saying that the Second Amendment did not apply [in Miller] was … that the *type of weapon at issue* was not eligible for Second Amendment protection."  Id. at 622 (emphasis in original) (citing Miller, 307 U.S. at 178).  Heller further explained that because "the traditional militia was formed from a pool of men bringing arms in common use at the time for lawful purposes like self-defense," "the Second Amendment does not protect those weapons not typically possessed by law-biding citizens for lawful purposes, such as short-barreled shotguns."  Id. at 624-25.  Accordingly, Heller clarified that "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" was consistent with the Second Amendment.  Id. at 627.  The Heller majority also remarked that it would be "startling" to conclude that "the National Firearms Act's restrictions on machineguns . . . might be unconstitutional[.]"  Id. at 624.  And Heller rejected the notion that a ban on military weapons like "M-16 rifles" would create any disconnect between the Second Amendment's prefatory clause and its operative clause.  Id. at 627.

Thus, although Heller did not present the issue of whether Section 922(o)'s ban on post-1986 machineguns is constitutional, its reasoning fully supports the conclusion that NFA firearms, including machine guns, fall outside the text and scope of the Second Amendment.

4.     *Hamblen v. United States*, 591 F.3d 471 (6th Cir. 2009)

One year after Heller, in the case of Hamblen v. United States, 591 F.3d 471 (6th Cir. 2009), the Sixth Circuit upheld the constitutionality of Section 922(o)'s ban on possessing post-

1986 machine guns.  <u>Hamblen</u> involved a former Tennessee State Guardsman who had been

convicted and sentenced in 2006 for possessing unregistered machineguns in violation of 18

U.S.C. § 922(o) and 26 U.S.C. § 5861(d).  591 F.3d at 472-73.  Hamblen later filed a Section

2255 post-conviction petition, challenging the constitutionality of his convictions under <u>Heller</u>

and the Second Amendment.  <u>See</u> <u>id.</u> at 473.  The Sixth Circuit squarely rejected Hamblen's

Second Amendment challenge, and held that Section 922(o)'s ban on possessing post-1986

machineguns is constitutional.  <u>Id.</u> at 473-74.  As the Sixth Circuit explained, "Hamblen's

challenge to his conviction for unlawful possession of unregistered machine guns has been

directly foreclosed by the Supreme Court, which specifically instructed in <u>Heller</u> that 'the

Second Amendment does not protect those weapons not typically possessed by law-abiding

citizens for lawful purposes.'"  <u>Hamblen</u>, 591 F.3d at 474 (quoting <u>Heller</u>, 128 S. Ct. at 2815-

16).  "Thus, whatever the individual right to keep and bear arms might entail, it does not

authorize an unlicensed individual to possess unregistered machine guns for personal use."

<u>Hamblen</u>, 591 F.3d at 474.

    As a published Sixth Circuit opinion, <u>Hamblen</u> is binding precedent on this Court, and

should "directly foreclose" Roberson's Second Amendment attack on Section 922(o)'s

constitutionality.  <u>See</u> <u>id.</u>  Further, although <u>Hamblen</u> was decided before the Supreme Court's

more recent decision in <u>Bruen</u>, which abrogated the means-ends test later developed by the Sixth

Circuit for evaluating firearm restrictions (<u>Bruen</u> is discussed more below), the Sixth Circuit's

reasoning in <u>Hamblen</u> did not invoke any means-ends scrutiny, and was instead based on the

conclusion that machineguns fall outside the scope of the Second Amendment's protections.  <u>See</u>

<u>Hamblen</u>, 591 F.3d at 474 (explaining that "'the Second Amendment *does not protect those*

*weapons not typically possessed by law-abiding citizens for lawful purposes*[,]'" which in

Hamblen, were machineguns) (quoting Heller, 128 S. Ct. at 2815-16) (emphasis added).  Further,

"since Heller was decided, every circuit court to address the issue has held that there is no

Second Amendment right to possess a machine gun."  United States v. Hoover, 635 F. Supp. 3d

1305, 1325 (M.D. Fla. 2022) (quoting United States v. Henry, 688 F. 3d 637, 639-40 (9th Cir.

2012), and citing cases); see also 56 A.L.R. Fed. 2d, § 27 (citing cases).

Hamblen should therefore "directly foreclose[]" Roberson's facial challenge to Section

922(o)'s constitutionality.  See 591 F.3d at 474.

5.      *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) and
        Post-*Bruen* Cases

The Supreme Court's recent decision in Bruen does not help Roberson.

In Bruen, the Supreme Court struck down, under the Second Amendment, a "special

needs" requirement for obtaining a license to carry a concealed handgun in New York state.  597

U.S. 1.  In doing so, Bruen clarified that the test for determining whether a law restricting

firearms violates the Second Amendment:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the
> Constitution presumptively protects that conduct.… Only if a firearm regulation is
> consistent with this Nation's historical tradition may a court conclude that the
> individual's conduct falls outside the Second Amendment's unqualified command.

597 U.S. at 17 (quotations omitted).   This abrogated a two-step test that had developed in some

circuits, including the Sixth Circuit, which required courts to employ means-ends scrutiny,

balancing the government's interest in the firearm restriction against the individual's Second

Amendment right.  Id. at 17-18.

But relevant here, Bruen reiterated that the Second Amendment protects only those

weapons "in common use" by private citizens at the time of is enactment.  Id. at 19.  Bruen also

noted that Heller "found it 'fairly supported by the historical tradition of prohibiting the carrying

of 'dangerous and unusual weapons' that the Second Amendment protects the possession and use

of weapons that are 'in common use at the time.'"  Bruen, 597 U.S. at 21 (quoting Heller, 554

U.S. at 627)  Accordingly, there is no indication that Bruen was disturbing earlier precedents

regarding NFA firearms and other "dangerous and unusual weapons."  See Bruen, 597 U.S. at 72

(Alito, J., concurring) (explaining that the decision in Bruen does not "decide anything about the

kinds of weapons that people may possess" or "about restrictions that may be imposed on the

possession or carrying of guns").

Recognizing that nothing in Bruen cast doubt on the long-standing federal restrictions on

machinegun possession and transfer, lower courts after Bruen have universally reaffirmed that

Section 922(o) is constitutional under the Second Amendment, including other district courts

here in the Sixth Circuit.  See United States v. Smith, No. 23-28-DLB-CJS, 2023 WL 6880423,

at *2 (E.D. Kentucky, Oct. 18, 2023) (explaining that "[n]othing in Bruen disturbs this holding

[in Hamblen that Section 922(o) is constitutional], since Section 922(o) "regulates conduct

outside of the scope of the Second Amendment"); United States v. Wilson, No. 2:23-CR-20081,

2023 WL 8288989, at *5 (W.D. Tennessee, November 7, 2023) (holding, in a case involving "a

switch that allegedly converts a handgun into . . . a 'machine gun,'" that "Section 922(o) . . .

regulate[s] conduct outside the scope of the Second Amendment"); United States v. Lane, No.

3:23-CR-62, __ F. Supp. 3d. __, 2023 WL 5663084, at (E.D. Virginia, Agust 31, 2023) (same

holding in case that also involved Glock switches) (appeal pending); United States v. Jones, No.

1:23-CR-126, __ F. Supp. 3d __, 2023 WL 8374409, at *7 (S.D. Alabama, December 3, 2023)

(rejecting, in a Glock switch case, defendant's challenge to the constitutionality of the NFA's

ban on possessing unregistered machineguns, and stating that "this Court joins with other courts

who have found [the NFA's ban on unregistered machineguns] does not require [historical]

analysis under <u>Bruen</u> and that even post-<u>Bruen</u>, Second Amendment protections simply do not extend to machineguns (or in this case one that has been converted to one)").

Unsurprisingly, Roberson's motion fails to cite a single case—either before or after <u>Bruen</u>—holding that Section 922(o)'s ban on possessing or transferring post-1986 machineguns is unconstitutional under the Second Amendment.  <u>See</u> (ECF 22: Motion to Dismiss Indictment).

Accordingly, given the Sixth Circuit's reported decision in <u>Hamblen</u>, which is binding precedent on this Court, as well as the weight of other lower court decisions since <u>Bruen</u>, Roberson's motion fails at the first part of the <u>Bruen</u> inquiry, since machineguns fall outside the scope and text of the Second Amendment.  This Court therefore need not engage in any historical analysis about machinegun regulations or analogous weapons under <u>Bruen</u>.

      6.      <u>Roberson's Arguments for not Considering Machineguns to be "Dangerous and Unusual" Fail.</u>

In his brief, Roberson acknowledge that "dangerous and unusual" weapons are excluded from Second Amendment protections, but he argues that machineguns should not qualify as such.  <u>See</u> (ECF 22: Motion to Dismiss Indictment, PageID 102-06).  In particular, Roberson claims that "machineguns are both commonly kept for self-defense and [are] useful in warfare," and then cites <u>Caetano v. Massachusetts</u>, 577 U.S. 411 (2016) (per curiam) as a guidepost for determining whether weapons are "dangerous and unusual."  (ECF 22: Motion to Dismiss Indictment, PageID 103).  This argument fails.

For one, <u>Caetano</u> did not hold that stun guns were in common use; instead, it remanded the case to the Supreme Judicial Court of Massachusetts to make that determination in the first instance.  <u>Caetano</u>, 577 U.S. at 412.  And the per curiam opinion in <u>Caetano</u> did not vacate the Massachusetts decision below based on any disagreement about the number of stun guns in circulation, or what that number means for purposes of Second Amendment protection.  <u>See id.</u>

13

Rather, the per curiam opinion did so because the Massachusetts Supreme Court applied a standard "inconsistent with <u>Heller</u>" when it erroneously "equat[ed] 'unusual' with 'in common use at the time of the Second Amendment's enactment.'" <u>Id.</u>  The <u>Caetano</u> per curiam opinion itself never delved into whether stun guns are "dangerous and unusual."  <u>See id.</u> at 411-12; <u>see also</u> <u>Lane</u>, __ F. Supp. 3d __, 2023 WL 5663084, at \*14 (explaining why <u>Caetano</u> does not support the proposition that machineguns are in common use).  And although Justice Alito, in a concurring opinion, thought it was probative that at least 200,000 stun guns had been sold to private citizens, he opined that stun guns were constitutionally protected only because they were also "accepted as a legitimate means of self-defense across the country" and were lawful to possess in 45 states.  <u>Caetano</u>, 577 U.S. at 420 (Alito, J., concurring).  In contrast, Roberson has presented no evidence to suggest that machineguns are "accepted as a legitimate means of self-defense across the country," or that they are legal in 45 out of 50 states, let alone any state at all.  So <u>Caetano</u> does not help Roberson.

Nor do Roberson's statistics about the number of machineguns help his argument.  Roberson cites statistics from the ATF reporting that "[a]s of May 2021, there were 741,146 [registered] machineguns possessed by Americans."  (ECF 22: Motion to Dismiss Indictment, PageID 104-05).  But there are problems with this statistic.  First, it is not clear whether or not this statistic also includes machineguns registered to the government.  <u>See</u> <u>Hollis v. Lynch</u>, 827 F.3d 436 (5th Cir. 2016) ("As for raw numbers, an ATF report provided by Hollis indicates that there are 175,977 pre-1986 *civilian-owned* machineguns in existence.") (emphasis added);  <u>see also</u> <u>Dewilde v. Attorney General</u>, No. 23-8054, Tenth Circuit Court of Appeals, Brief of Defendant-Appellee United States of America, Page 54 (noting that the number of civilian-registered machineguns is "no greater than 175,977" after discounting government-registered

14

machine guns, based on the description in Hollis and the district court record below).  Second,

the raw number of machineguns in legal circulation with civilians is only one piece of the

inquiry, and even then, it is not enough to establish that machineguns are in "common use."  For

example, the district court in United States v. Simien, 655 F. Supp. 3d 540 (W.D. Texas,

February 10, 2023) considered this same argument, and found that machineguns are not in

common use:

> Today, machineguns remain dangerous and unusual. Machineguns, which have
> been likened to pipe bombs and hand-grenades, are within the category of weapons
> of "quasi-suspect character" that are inherently dangerous.  They are also unusual.
> In Hollis [v. Lynch], the [Fifth Circuit] held that the number of civilian-owned
> machineguns, about 176,000, fell far short of the amount necessary to be considered
> in common use.  Circumstances have not meaningfully changed since then.
> Although the number of civilian-owned machineguns has increased to about
> 740,000, this amount—which is less than [0].2% of total firearms in the United
> States—remains too insignificant for machineguns to be considered in common
> use.

655 F. Supp. at 543 (internal citations omitted); see also Lane, __ F. Supp. 3d __, 2023 WL

5663084, at *15.  And this is to say nothing of the fact that Glock switches are black market

devices designed to transform an otherwise legal Glock pistol into a fully-automatic machinegun.

In that way, Glock switches should be viewed as even more "dangerous and unusual" than

traditional machineguns, like an M-16, which the Supreme Court already remarked in Heller

"may be banned."  See Heller, 544 U.S. at 627.

In short, Roberson's claim that machineguns are not "dangerous and unusual" is without

support.

C.     <u>EVEN IF THIS COURT WERE TO CONCLUDE THAT MACHINEGUNS FALL WITHIN THE TEXT AND SCOPE OF THE SECOND AMENDMENT, THIS NATION'S HISTORY AND TRADITIONS FULLY SUPPORT SECTION 922(O)'S PROHIBITION ON THE POSSESSION OF POST-1986 MACHINEGUNS.</u>

Even if, contrary to the weight of current authority, this Court were to conclude that the Second Amendment's text and scope protects the possession of machineguns manufactured after 1986, Section 922(o) would still not violate the Second Amendment, since that statute is "consistent with this Nation's historical tradition of firearm regulation." <u>Bruen</u>, 597 U.S. at 17.

To assess "whether modern firearm regulations are consistent with the Second Amendment's text and historical understanding," <u>Bruen</u> contemplated two avenues of inquiry: (1) a "straightforward historical inquiry" to search for, most relevant here, historical regulations similar to the modern-day regulatory counterpart at issue or evidence that a comparable historical regulation was rejected on constitutional grounds; or (2) a "historical analogy," for instances where there is no such straightforward correspondence between the challenged law and predecessors. <u>Id.</u> at 26-28.

The "straightforward historical inquiry" that <u>Bruen</u> described suffices for purposes of Roberson's challenge to Section 922(o). <u>Heller</u> explained—and <u>Bruen</u> reaffirmed—that the nation's "historical tradition" includes "prohibiting the carrying of dangerous and unusual weapons." <u>Heller</u>, 554 U.S. at 637; <u>Bruen</u>, 597 U.S. at 21. <u>Heller</u> cited numerous historical sources in support of the tradition of banned dangerous and unusual weapons. <u>See</u> <u>Heller</u>, 554 U.S. at 627 (citing sources from the 18th and 19th centuries). These sources provide ample support for the "historical tradition" limitation of the Second Amendment to arms "of the kind in common use." <u>Heller</u>, 554 U.S. at 624 (quoting <u>Miller</u>, 307 U.S. at 179).

For example, under English common law, "the offense of riding or going armed, with dangerous or unusual weapons, [was] a crime." 4 W. Blackstone, Commentaries on the Laws of

England 148–49 (1769).  In the United States, too, courts long ago acknowledged that a man commits "an offence at common law" when he arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."  State v. Langford, 3 Hawks 381, 383 (N.C. 1824).  This common-use limitation is consistent with the Second Amendment's prefatory clause:  "The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense."  Heller, 554 U.S. at 624. As indicated above, Heller recognized that "[i]t may be objected that if weapons that are most useful in [modern] military service — M-16 rifles and the like — may be banned, then the Second Amendment right is completely detached from the prefatory clause" that refers to militias.  Id. at 627–28.  But Heller explained "the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right."  Id. at 628.  Bruen did not change this aspect of Heller.  Instead, Bruen reaffirmed Heller's finding that there is a "fairly supported" "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  Bruen, 597 U.S. at 21 (citing 4 W. Blackstone, Commentaries on the Laws of England at 148-49; Miller, 307 U.S. at 179).

In light of the conclusion in Heller and Bruen that our nation's historical tradition includes regulating dangerous and unusual firearms—a conclusion rooted in a variety of historical resources unrefuted by Roberson—this Court should reject Roberson's constitutional challenge to Section 922(o) on historical grounds, assuming it does not already conclude that the plain text of the Second Amendment does not cover the possession of machineguns, or that Roberson's as-applied challenge fails.

17

      D.      ROBERSON'S AS-APPLIED CHALLENGE FAILS, ESPECIALLY IN LIGHT OF HIS CRIMINAL CONDUCT THAT ENTAILED IMPORTING BLACK MARKET GLOCK SWITCHES FROM RUSSIA AND CHINA. AND THEN SELLING THEM TO CUSTOMERS OVER SOCIAL MEDIA.

Roberson also raises an as-applied Second Amendment challenge.  This argument likewise fails.

In contrast to a facial challenge, an as-applied challenge tests only whether the contested "law is unconstitutional as enforced against the [party] before the court" based on the discrete facts in the case.  Speet v. Schuette, 726 F.3d 867, 872 (6th Cir. 2013).  In evaluating a motion to dismiss, the court must read the indictment "as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications."  United States v. McAuliffe, 490 F.3d 526, 531 (6th Cir. 2007).

The allegations in Roberson's case are far from the heartland of the Second Amendment. The indictment details how Roberson engaged in a conspiracy to smuggle black market Glock switches into the United States from dealers in Russia and China, and then resell those switches to customers through his social media accounts.  See (ECF 1: Indictment).  In that way, Roberson's conduct goes beyond mere possession of firearms for personal use or self-defense, and crosses into the realm of commercial activity, which is subject to more stringent regulation and less Second Amendment protection.  See United States v. McNulty, No. 22-10037, __ F. Supp. 3d. __, 2023 WL 4826950, at *4-5 (D. Massachusetts, July 27, 2023) (considering, post-Bruen, the Second Amendment's application to regulations on firearm commerce, and observing that "[t]he Second Amendment's protection of firearm commerce, if any such protection exists, is qualified."); McDonald v. City of Chicago, 561 U.S. 742, 767 (2010) (explaining that "self-defense is "'the central component' of the Second Amendment right") (quoting Heller, 544 U.S. at 599).  Roberson's commercial activity of importing and reselling machinegun parts, as

18

detailed in the indictment, should therefore be enough to reject his as-applied Second Amendment challenge.

Roberson also contradicts his Second Amendment claim by asserting that he is only "charged with being in possession of Glock switches," and that "[w]ithout being installed on a firearm, Glock switches are nothing more than a useless piece of plastic."  See (ECF 22: Motion to Dismiss, PageID 107).  But if, as Roberson claims, the extent of his criminal conduct was merely possessing a "useless piece of plastic," then Roberson would have no basis for invoking the Second Amendment, which by its plain text, only applies to "Arms."  See U.S. Const. amend II.  So even assuming that machineguns fall within the text and scope of the Second Amendment—and as discussed above, they do not—Roberson fails to explain why he should enjoy Second Amendment protection for possessing an item that is merely, in his own words, a "useless piece of plastic."

Finally, Roberson's argument that he "merely possess[ed] the weapon," and did not "bear[] it in such a manner as to 'terrorize the people[,]'" misses the mark, for two reasons. First, the indictment describes how Roberson engaged in more conduct than merely possessing Glock switches:  he imported Glock switches from dealers in foreign countries, he resold the devices in the United States for hundreds of dollars, and he also counseled a customer in Wisconsin whose Glock switch malfunctioned after attaching it to their firearm about how to make the pistol "full auto."  (ECF 1: Indictment, ¶ 6, 26, 30).  Roberson's motion fails to even acknowledge these allegations in the indictment, let alone explain how they could be entitled to Second Amendment protection in the context of an as-applied challenge.  (ECF 22: Motion to Dismiss Indictment).  Second, even assuming that the only criminal conduct Roberson committed was possessing a single Glock switch for a reason related to self-defense—and again,

19

the indictment details how Roberson's conduct far exceeded personal possession of a Glock switch—case law reflects that the mere possession of dangerous and unusual weapons, like NFA firearms, falls outside the Second Amendment's scope.  See Miller 305 U.S. at 175-78 (holding that defendants' possession of a short-barreled shotgun was not protected by Second Amendment); Hamblen 591 F.3d at 474 (holding that defendant's possession of machineguns was not protected by the Second Amendment).[2]

For those reasons, the Court should reject Roberson's as-applied Second Amendment challenge.

**Conclusion**

This Court should DENY Roberson's Motion to Dismiss the Indictment.  (ECF 22).

Respectfully submitted,

REBECCA C. LUTZKO
United States Attorney

By:  /s/ James P. Lewis
     James P. Lewis (MD: 1412170148)
     Assistant United States Attorney
     United States Court House
     801 West Superior Avenue, Suite 400
     Cleveland, OH 44113
     (216) 622-3958
     (216) 522-7499 (facsimile)
     James.Lewis@usdoj.gov

---

[2] For those same reasons, Roberson's assertion that the Second Amendment only permits restrictions on "bearing" machineguns "in such a manner as to 'terrorize the people,'" and not restrictions on "merely possessing such weapons," fails.  See (ECF 22: Motion to Dismiss Indictment, PageID 106-07).